**FROST LLP**
Amy Wilkins Hoffman (SBN 022762)
99 E. Virginia Ave., Ste 220
Phoenix, AZ 85004
E-Mail: amyh@frostllp.com
Phone: 480-466-7005

**THE CASAS LAW FIRM, PC**
John V. Golaszewski*
1740 Broadway, 15th Floor
New York, NY 10019
E-Mail: John@talentrights.law
Phone: 855-220-9626
*Pro hac vice application forthcoming

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Tiffany Gray aka Tiffany Toth, a California resident; Sandra Valencia, a Columbia resident; Lina Posada, a California resident; Jessica Nichole Rockwell, a California resident; Monica Leigh Burkhardt, a New York resident; Irina Voronina, a California resident; Katarina Van Derham, a California resident; Carissa Rosario, a Florida resident; Gallienne Nabila, a California resident; and Anya Monzikova Fritts, a California resident, | Case No. _____ |
|  | **COMPLAINT** |
|  | (Jury Trial Demanded) |
| Plaintiffs, |  |
| - against - |  |

1

Nathan Heida, LLC, dba The Alement,
an Arizona limited liability company;
and Nathan K. Heida and Jane Doe
Heida, a married couple residing in
Yuma County,

Defendants.

Plaintiffs Tiffany Gray aka Tiffany Toth, Sandra Valencia, Lina Posada, Jessica Nichole Rockwell, Monica Leigh Burkhardt, Irina Voronina, Katarina Van Derham, Carissa Rosario, Gallienne Nabila and Anya Monzikova Fritts, (collectively, "Plaintiffs"), file this Complaint against Nathan Heida, LLC, dba The Alement and Nathan K. Heida (collectively, "Defendants") respectfully allege as follows:

1.      This is an action for damages and injunctive relief relating to Defendants' misappropriation, alteration, and unauthorized publication and use in advertising of images of Plaintiffs, each of whom are well-known professional models, to promote their night club, The Alement, located at 179 East 1st Street, Yuma, Arizona 85364 (hereinafter referred to as the "Night Club" or "The Alement").

2.      As detailed below, Defendants' misappropriation and unauthorized use of Plaintiffs' images, photos and likenesses (collectively, "Images") constitutes: a) Violation of §43 of the Lanham Act, 15 U.S.C. §1125 (a)(1)(A) - False Association; b) Common Law Right of Publicity; c) Unfair or Deceptive Trade Practices, A.R.S. Title 44, Chapter 9, et seq.; d) Common Law Unfair Competition; e) Defamation; f) Negligence and Respondeat Superior; g) Conversion; h) Unjust Enrichment; and i) Quantum Meruit.

3.      In addition to the actual, compensatory, and exemplary damages set forth

below, Plaintiffs likewise seek an Order from this Court permanently enjoining Defendants from using any of their Images in any way and through any medium.

## JURISDICTION & VENUE

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs have stated claims under the Lanham Act, 15 U.S.C. § 1125(a)(1).

5.    This Court has jurisdiction over the state law claims asserted, pursuant to 28 U.S.C. § 1367.

6.    Plaintiffs are, and at all times relevant to this action have been, professional models who reside throughout the United States.

7.    According to publicly available records, Defendant Nathan Heida, LLC, is a limited liability company formed under the laws of the state of Arizona, with its principal place of business located at 3020 Arizona Ave, Yuma, Arizona, 85364. Upon information and belief, Nathan Heida, LLC operates The Alement, which is located at 179 E 1st Street, Yuma, Arizona 85364.

8.    According to publicly available records, Defendant Nathan K. Heida is an individual operating under the laws of Arizona. Heida is an member and manager of Nathan Heida, LLC. Upon information and belief, Nathan K. Heida can be located at 14772 South Ave 41/2 East, Yuma, Arizona 85365.

9.    Upon information and belief, Defendants Nathan K. Heida and Jane Doe Heida (collectively, "Heida") are husband and wife and the owners and operators of The Alement.

10.    Upon information and belief, the acts of Nathan K. Heida as alleged herein

3

were for the benefit of the marital community, and, upon information and belief, Jane Doe Heida knew of, participated in, consented to, and/or ratified the acts of Nathan K. Heida as alleged herein.

11.     Upon information and belief, the acts of Jane Doe Heida as alleged herein were for the benefit of the marital community, and, upon information and belief, Nathan K. Heida knew of, participated in, consented to, and/or ratified the acts of Jane Doe Heida as alleged herein.

12.     Venue is proper in the United States District Court for the District of Arizona because Defendants' principal place of business is located in Yuma County, Arizona.

13.     A significant portion of the alleged causes of action arose and accrued in Yuma County, Arizona, and the center of gravity for a significant portion of all relevant events alleged in this complaint is predominately located in Yuma County, Arizona.

## PARTIES

*Plaintiffs*

14.     Plaintiff Tiffany Toth a/k/a Tiffany Gray ("Gray") is a well-known professional model and a resident of Orange County, California.

15.     Plaintiff Sandra Valencia ("Valencia") is a well-known professional model and a resident of Colombia.

16.     Plaintiff Lina Posada ("Posada") is a well-known professional model and a resident of San Bernardino County, California.

17.     Plaintiff Jessica Nichole Rockwell ("Rockwell") is a well-known

professional model and a resident of Los Angeles County, California.

18.    Plaintiff Monica Leigh Burkhardt ("Burkhardt") is a well-known professional model and a resident of Suffolk County, New York.

19.    Plaintiff Irina Voronina ("Voronina") is a well-known professional model and a resident of Los Angeles County, California.

20.    Plaintiff Katarina Van Derham ("Derham") is a well-known professional model and a resident of Los Angeles County, California.

21.    Plaintiff Carissa Rosario ("Rosario") is a well-known professional model and a resident of Broward County, Florida.

22.    Plaintiff Gallienne Nabila ("Nabila") is a well-known professional model and a resident of Los Angeles County, California.

23.    Plaintiff Anya Monzikova Fritts ("Fritts") is a well-known professional model and a resident of Los Angeles County, California.

***Defendants***

24.    Defendant Nathan Heida, LLC, is a limited liability company formed under the laws of the state of Arizona and registered to conduct business in Arizona. During times relevant to this action, Nathan Heida, LLC, operated The Alement.

25.     According to publicly available records, Nathan K. Heida, in his capacity as member and manager of Nathan Heida, LLC, maintained operational control over The Alement including all advertising relating thereto.

## **FACTUAL ALLEGATIONS**

26.    Each Plaintiff is a well-known professional model who earns her livelihood

5

modeling and licensing her Images to companies, magazines and individuals for the purpose of advertising products and services.

27.    Plaintiffs' careers in the modeling industry place a high degree of value on their good will and reputation, which is critical to maximize their earning potential, book modeling contracts, and establish each of their individual brands. In furtherance of establishing, and maintaining, their brands, Plaintiffs are necessarily selective concerning the companies and brands for which they model.

28.    Each of the Plaintiffs' Images was misappropriated, and intentionally altered, by Defendants to make it appear that they worked at, endorsed, or were otherwise associated or affiliated with Defendants.

29.    In the case of each Plaintiff, this apparent claim was false.

30.    Moreover, this misappropriation occurred without any Plaintiff's knowledge, consent, or authorization.

31.    No Plaintiff has ever received any remuneration for Defendants' improper and illegal use of their Images, and Defendants' improper and illegal use of Plaintiffs' Images have caused each Plaintiff to suffer substantial monetary damages and harm to their reputation.

32.    Further, in certain cases Defendants misappropriated Plaintiffs' advertising ideas because the Images they misappropriated came from Plaintiffs' own social media pages, which each Plaintiff uses to market to potential clients, grow their fan base, and build and maintain their brand.

***Plaintiffs' Individual Backgrounds and Careers***

33.    Gray is a successful professional model and *Playboy* Playmate. Gray was the *Playboy* "Cyber Girl of the Month" for May 2006. She then went on to pose for three pictorials under *Playboy*'s "Fresh Faces." Moreover, she has been featured in such magazines as *Super Street Bike*, *Import Tuner*, *Sport Truck*, *Iron Man*, *Muscle & Fitness*, *Guitar World*, *Ripped*, *Seventeen*, *Pump*, and *Maxim*. Gray has also posed for various catalogs and has made appearances on television shows such as *Tosh.O* and *The Daily Habit*. She has booked jobs shooting for lingerie companies such as Shirley of Hollywood, Seven Til Midnight, Elegant Moments, and Jvalentine. She is also a real estate agent in Southern California and part owner of Sugar Taco, a plant-based restaurant located in Los Angeles. Gray currently has over 3.7 million Facebook followers, 1.2 million Instagram followers, and over 368,700 X (formerly known as Twitter) followers.[1]

34.    That we know of, Gray is depicted in the photo in Exhibit "A" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Gray was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

35.    Gray has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

36.    Valencia is, and at all times relevant to this action was, a successful

---

[1]In the modeling world and talent industry (in general), the number of online Instagram "followers", X "followers", and or Facebook "likes" is a strong factor in determining a model's earning capacity.

professional model regarded as one of the top models in her home country of Colombia. Valencia has modeled in Ecuador, Peru, the Dominican Republic, Mexico, and Venezuela. She has worked with clients such as Diesel, Americanino, Leonisa, Chevignon, and Onde de Mar, and is the contract face of Bésame Lingerie. She currently has 151,000 Instagram followers and over 72,300 X (formerly known as Twitter) followers.

37.    That we know of, Valencia is depicted in the photo in Exhibit "B" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Valencia was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

38.    Valencia has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

39.    Posada is a fashion model and designer. A native of Colombia, Posada is best known as a model for the Bésame and Espiral lingerie collections. Posada has also modeled for Paradizia Swimwear, Babalu Swimwear, Irgus Swimwear, Ujeans, as well as many others. She currently has 102,000 Instagram followers, 4,120 YouTube subscribers, 17,300 Facebook followers, and over 5,200 Twitter followers.

40.    That we know of, Posada is depicted in the photo in Exhibit "C" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Posada was either an employee working at The Alement, that she endorsed The

Alement, or that she was otherwise associated or affiliated with The Alement.

41.    Posada has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

42.    Rockwell is a model and actress. She is well known for ANGRY VIDEO GAME NERD: THE MOVIE (2014), IMMIGRANTS (2009), and A QUE NO PUEDES! (2007). She has also appeared in films and on television shows such as *Sons of Anarchy*, *Entourage*, *Knight Rider*, and HEROES and she has done music videos for Nickelback and Baby Bash. Rockwell has done prints as a catalog model for Dreamgirl Lingerie, No Fear Calendar, and Shift Clothing. Rockwell modeled for *Hooter*'s magazine and calendar, *Extreme RC Car* magazine, and *Racer X* magazine among others.

43.    That we know of, Rockwell is depicted in the photo in Exhibit "D" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Rockwell was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

44.    Rockwell has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

45.    Burkhardt worked as a bartender and dental assistant prior to becoming a

professional model and *Playboy* Playmate.    She has modeled for *Playboy* in various newsstand special editions. For example, she was featured on the cover of *Playboy*'s "College Girls" in September 2005. She was the *Playboy* "Cyber Girl of the Week" for August 29, 2005, and the "Cyber Girl of the Month" for December 2005. Burkhardt was subsequently named "Cyber Girl of the Year" for 2006. Moreover, she was the Playmate of the Month in the March 2006 issue of *Playboy* and graced the cover of the August 2006 issue. Burkhardt has appeared in several *Playboy* videos and on a handful of episodes of the reality television series, *The Girls Next Door* (2005). She has acting roles in the movies THE DUEL (2006), THE POOL BOYS (2009), THE GENTLEMAN (2007), and ROAD RAIDERS (2000). Burkhardt has also appeared in SPIDER-MAN 3 (2007) and on episodes of *Entourage* (2004) and *CSI: Miami* (2002).

46.    That we know of, Burkhardt is depicted in the photo in Exhibit "E" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Burkhardt was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

47.    Burkhardt has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

48.    Voronina is an international model and actress. After becoming *Playboy*'s Miss January 2001, she represented international brands including SKYY Vodka, Miller

Lite, Michelob Ultra, Bacardi, and Sisley & Detour. She has millions of visual impressions around the globe via the covers and pages of worldwide magazines such as *FHM*, *Maxim*, *Playboy* (in 20 countries), *Max*, *Ocean*, *Shape*, *944*, *Knockout*, *Q*, *People*, *Kandy*, *Rukus*, *Vape* and *Browz*. In 2008, Voronina was named St. Pauli Girl spokesmodel and completed a 12-month public relations tour across America. She became the first ever St. Pauli Girl to ring the NYSE closing bell representing Constellation Brands. In 2013, Voronina was named *Kandy* magazine's Model of the Year as a result of her fans downloading the highest number of digital issues that year. Voronina got her first big screen break in *Reno 911! Miami*. Her credits include a series regular role in *Svetlana* for HD Net, the first ever live action show on Adult Swim Network *Saul of the Mole Men*, a guest star appearance on Nickelodeon's *iCarly*, Comedy Central's *Reno 911!*, and feature film parts in Balls of Fury, Piranha 3DD, Laser Team, and Killing Hasselhoff. She starred in the indie action flick Scramble which she also co-produced. Voronina tours and performs nationally as a stand-up comedian. She stays active daily across all social media outlets for her followers on Facebook, Instagram, X (formerly known as Twitter) and YouTube. She has more than 5.6 million social media followers.

49.    That we know of, Voronina is depicted in the photo in Exhibit "F" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Voronina was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

50.    Voronina has never been employed at Defendant's establishment, has never

been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

51.    Van Derham is a successful model, actress, philanthropist, and entrepreneur. As a model, Van Derham has appeared on over 60 magazine covers and appeared in over 600 media outlets including the Time Square jumbotron, CNN, FOX, and NBC. She appeared in 17 national and international print and television commercials and has been voted one of the 100 sexiest women in the world by magazines in three different continents. Van Derham made history by being the only St. Pauli Girl spokesmodel who got re-elected. As an actress, she played opposite Bob Saget in the TV show *Entourage* and played one of the lead roles in the movie, UNBELIEVABLE (2020). Currently, Van Derham is working on the movie, VENDETTA VETTE. She is also a founder, CEO, and editor-in-chief of classic, glamour lifestyle magazine, *Viva* Glam. Her well-respected status gets her invited to judge model contests and beauty pageants around the globe. She has over 210,000 Instagram followers, over 11,000 Twitter followers, and over 190,000 Facebook followers.

52.    That we know of, Van Derham is depicted in the photo in Exhibit "G" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Van Derham was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

53.    Van Derham has never been employed at Defendant's establishment, has

12

never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

54.    Rosario is a model, spokesperson, and businesswoman. She has modeled in commercials for Budweiser and Comcast, and is a spokesperson for Monster Energy Drinks, Protein World, and Budweiser. She has also appeared in magazines such as *International Maxim*, *GQ*, *FHM*, *Mode Lifestyla*, *Rukus*, *DSS* Spain, and others. Rosario also has her own perfume company line. She is well known on social media, with over 1.8 million Facebook followers, over 1 million Instagram followers, and over 37,300 X (formerly known as Twitter) followers.

55.    That we know of, Rosario is depicted in the photo in Exhibit "H" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Rosario was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

56.    Rosario has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

57.    Nabila is an actress and professional model. From a young age, she participated in pageants, public speaking, dance, community service work, and singing. Nabila has been in the entertainment industry for over a decade working with brands such as Fashion Nova. She is currently signed to Wilhelmina Los Angeles and has a nonprofit

geared towards the empowerment and advancement of young women. Nabila has over two million social media followers.

58.    That we know of, Nabila is depicted in the photo in Exhibit "I" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Nabila was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

59.    Nabila has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

60.    Fritts is a professional model and actress. Starting in 2006, she had reoccurring work as a briefcase model on NBC's *Deal or No Deal*; she remained in that role until the end of the show in 2009. In 2007, Fritts had the role of 'The Wounded Angel' in the music video for *Amaranth* by Nightwish, a Finnish metal band. In 2008, Fritts played Jessica Jaynes in *CSI: Crime Scene Investigation* episode "Drop's Out." Her other film and television appearances consist of a role in the television show *Melissa & Joey*, *Bones*, *Body of Proof*, *Knight Rider*, *CSI: Crime Scene Investigation*, *CSI: Miami*, *Femme Fatales*, *In Plain Sight*, TROPIC THUNDER (2008), ZOMBIE APOCALYPSE (2011), TOO LITTLE TOO LATE, SOMEBODY MARRY ME (2013), SEEKING DOLLY PARTON (2015), SURROGATES (2009), and IRON MAN 2 (2010). Fritts was featured in the August 2007 issue of *Stuff* magazine, as well as the cover of *Runway* magazine. She has appeared in other magazines such as *Maxim*, *Cosmopolitan*, *Vogue*, and *People*. Fritts has over 14,000

followers on Instagram and over 1,000 followers on Facebook.

61.    That we know of, Fritts is depicted in the photo in Exhibit "J" to promote The Alement on its Facebook page. This Image was intentionally altered to make it appear that Fritts was either an employee working at The Alement, that she endorsed The Alement, or that she was otherwise associated or affiliated with The Alement.

62.    Fritts has never been employed at Defendant's establishment, has never been hired to endorse Defendant, has never been otherwise associated or affiliated with Defendant, has received no remuneration for Defendant's unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

### Defendants' Business Activities and Misappropriation

63.    Defendants operate (or operated, during the relevant time period,) a Night Club, where they are (or were) engaged in the business of selling alcohol and food in a sexually charged atmosphere.

64.    Defendants own, operate, and control The Alement's social media accounts, including its Facebook, Twitter, and Instagram accounts.

65.    Defendants used The Alement's Facebook, Twitter, and Instagram accounts to promote The Alement and to attract patrons.

66.    Defendants did this for their own commercial and financial benefit.

67.    Defendants have used, advertised, created, printed, and distributed the Images of Plaintiffs, as further described and identified above, to create the false impression with potential clientele that each Plaintiff either worked at The Alement, endorsed The Alement, or was otherwise associated or affiliated with The Alement.

68.    Defendants used Plaintiffs' Images and created the false impression with the public that Plaintiffs worked at or endorsed The Alement to receive certain benefits from that false impression, including but not limited to: monetary payments; increased promotional, advertising, marketing, and other public relations benefits; notoriety; publicity; and an increase in business revenue, profits, proceeds, and income.

69.    Defendants were well aware that none of the Plaintiffs have ever been affiliated with or employed by The Alement, and at no point have any of the Plaintiffs ever endorsed The Alement or otherwise been affiliated or associated with The Alement.

70.    All of Defendants' activities, including their misappropriation and republication of Plaintiffs' Images, were done without the knowledge or consent of Plaintiffs.

71.    Defendants have never compensated Plaintiffs for the unauthorized use of Plaintiffs' Images.

72.    Plaintiffs have never received any benefit from Defendants' unauthorized use of their Images.

***Standard Business Practices in the Modeling Industry***

73.    It is common knowledge in the modeling industry that the hiring of a model for a commercial purpose involves a particularized methodology and process.

74.    The fee that a professional model, like each Plaintiff, will receive is negotiated by their agency, and involves consideration of, without limitation, at least the following factors: a) the reputation, earning capacity, experience, and demand of that particular model; b) where and how long the photo shoot takes place; c) where and how

16

the images are going to be used by the client (*e.g.*, company website, social media, television commercials, billboards, or posters), known in the modeling industry as "usage"; and, d) the length of time the rights to use the photos will be assigned, known in the modeling industry at the "term."

75.    Most licenses to use a model's image are for one, two, or three year terms; but almost never is there a "lifetime" term.

***Defendants' Misappropriation of Plaintiffs' Images***

76.    Defendants were aware that, by using Plaintiffs' Images, they were violating Plaintiffs' right to privacy, Plaintiffs' right of publicity, and creating a false impression to potential customers that Plaintiffs worked at or endorsed The Alement.

77.    Unauthorized use of Plaintiffs' Images deprives them of income they are owed relating to the commercialization of their Images.

78.    In addition, Plaintiffs allege that the improper unauthorized use of their Images at issue in this case has substantially injured their respective careers and reputations, because of the negative connotations of false impression of association with The Alement.

79.    At no point was any Plaintiff ever contacted by any Defendant, or any representative of any Defendant, to request the use of any of Plaintiffs' Images.

80.    No Defendant ever obtained, either directly or indirectly, permission to use any of Plaintiffs' Images.

81.    No Defendant ever paid any Plaintiff for its use of her Images on any promotional materials, including The Alement's website, Twitter, Facebook, or

Instagram accounts.

82.     Defendants used Plaintiffs' Images without their consent, and without providing remuneration, in order to permanently deprive each of the Plaintiffs of her right to use her Images.

**FIRST CAUSE OF ACTION**

**(Violation of §43 of the Lanham Act, 15 U.S.C. §1125 (a)(1)(A) - False Association)**

83.     Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

84.     The provisions of the Lanham Act, 15 U.S.C. §1125, et seq. apply to Defendants and protect Plaintiffs from the conduct described herein.

85.     Defendants used Plaintiffs' Images, inter alia, in order to create the false impression with the public that Plaintiffs were affiliated, connected, or associated with Defendants or worked at as employees, sponsored, approved, or endorsed Defendants' goods, services or commercial activities.

86.     This was done to promote and attract clientele to Defendants, and thereby generate revenue for Defendants. Thus, this was done in furtherance of Defendants' commercial benefit.

87.     Despite the fact that Defendants were at all times aware that the Plaintiffs were neither affiliated, connected or associated with Defendants, nor worked at, sponsored, or approved of Defendants' goods, services or commercial activities,

Defendants nevertheless used Plaintiffs' Images in order to mislead potential customers as to Plaintiffs' employment at and/or affiliation with Defendants.

88.    Defendants knew that its use of Plaintiffs' Images would cause consumer confusion as to Plaintiffs' sponsorship, affiliation, connection, association and/or employment with Defendants' establishment.

89.    Upon information and belief, Defendants' use of Plaintiffs' Images did in fact cause consumer confusion as to Plaintiffs' employment at and/or endorsement of the Defendants' establishment, and the goods and services provided by Defendants.

90.    Due to Defendants' unauthorized use of Plaintiffs' Images in order to create a false endorsement prohibited by section 43 of the Lanham Act, Plaintiffs have been damaged in an amount to be determined at trial, but in all events, not less than seventy-five thousand dollars ($75,000), and are likewise entitled to punitive and exemplary damages.

## SECOND CAUSE OF ACTION

### (Common Law Right of Publicity)

91.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

92.    As set forth hereon, each Plaintiff has and had at the time of Defendants' misappropriation a commercial interest in their Image, photo, persona and likeness.

93.    Said commercial interest was developed by each Plaintiffs through their investment of time, effort and money in their career, image, persona and likeness.

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

94.    As set forth herein, Defendants used each Plaintiffs' Image and likeness for commercial purposes by using same in Defendants' advertising.

95.    Defendants did so without the consent of any Plaintiff, written or otherwise.

96.    Plaintiffs are further informed and believe and hereon allege that discovery will prove that Defendants republicized Plaintiffs' Image and likeness on various occasions, via different mediums, after the initial date of the posting of their Image and likeness and through the filing of this complaint.

97.    Plaintiffs are informed and believe and hereon allege that Defendants' republication of Plaintiffs' Image and likeness was altered so as to reach a new audience and/or promote a different product.

98.    Defendants were at all relevant times aware that it never received any Plaintiffs' permission or consent to use their Images on any website or social media account, or on any other medium, in order to promote the Defendants' establishment.

99.    At no point did Defendants ever compensate Plaintiffs for its use of their Images.

100.    No applicable privilege or authorization exists for Defendants' use of Plaintiffs' Images.

101.    In addition, because Defendants' actions in misappropriating Plaintiffs' Images and violating their common law right of publicity was willful and outrageous, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**

**(Unfair or Deceptive Trade Practices, A.R.S. Title 44, Chapter 9, et seq.)**

102.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

103.    Defendants operated the Defendants' website and social media accounts in order to promote the establishment, to attract clientele thereto, and to thereby generate revenue for Defendants.

104.    As such, Defendants' operation of the website and social media accounts, and its publication of Images thereon, was consumer-oriented in nature and occurred in the trade and commerce with the State of Arizona.

105.    Defendants published Plaintiffs' Images on the Defendants' website and social media accounts in order to create the false impression that Plaintiffs were either employees working at the establishment, endorsed the establishment, or were otherwise affiliated, associated, or connected with the establishment.

106.    As such, Defendants' intent in publishing Plaintiffs' Images was to mislead the public as to Plaintiffs' employment at and/or affiliation with the Defendants' establishment.

107.    Plaintiffs are further informed and believe and hereon allege that discovery will prove that Defendants republicized Plaintiffs' Image and likeness on various occasions, via different mediums, after the initial date of the posting of their Image and likeness and through the filing of this complaint.

21

108.    Defendants' advertising practices offends the public policy of Arizona insofar as it constitutes misappropriation of Plaintiffs' property rights in their own Images, and invasion of Plaintiffs' privacy, for Defendants' commercial benefit.

109.    Defendants' advertising practices are immoral, unethical, oppressive and unscrupulous insofar as they have sought to confuse the public for their own commercial benefit by implying that Plaintiffs' are affiliated, endorse, or are associated with the establishment.

110.    Defendants' advertising practices cause substantial injury to consumers by creating the false impression that Plaintiffs are employees or entertainers at, endorse, or are otherwise affiliated with, their establishment.

111.    There are no benefits to Defendants' advertising practices as set forth hereon except a benefit to Defendants' own commercial interests.

112.    As a result of Defendants' unauthorized and misleading publication of Plaintiffs' Images on their website and social media accounts, Plaintiffs were harmed.

113.    As a result of Defendants' unauthorized and misleading use of Plaintiffss' Images, Plaintiffs have suffered damages in an amount to be determined at trial, including punitive and exemplary damages.

## **FOURTH CAUSE OF ACTION**

### **(Common Law Unfair Competition)**

114.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

22

115.    Defendants operated the Defendants' website and social media accounts in order to promote the establishment, to attract clientele thereto, and to thereby generate revenue for Defendants.

116.    As such, Defendants' operation of the website and social media accounts, and its publication of Images thereon, was consumer-oriented in nature and occurred in the trade and commerce with the State of Arizona.

117.    Defendants published Plaintiffs' Images on the Defendants' website and social media accounts in order to create the false impression that Plaintiffs were either employees working at the establishment, endorsed the establishment, or were otherwise affiliated, associated, or connected with the Defendants' establishment.

118.    As such, Defendants' intent in publishing Plaintiffs' Images was to mislead the public as to Plaintiffs' employment at and/or affiliation with the Defendants' establishment.

119.    Such conduct constitutes unfair and deceptive acts and practices, and unfair competition under Arizona law.

120.    Defendants' advertising practices offends the public policy of Arizona insofar as it constitutes misappropriation of Plaintiffs' property rights in their own Images, and invasion of Plaintiffs' privacy, for Defendant commercial benefit.

121.    Defendants' advertising practices are immoral, unethical, oppressive and unscrupulous insofar as they have sought to confuse the public for their own commercial benefit by implying that Plaintiffs are affiliated, endorse, are associated with their establishment.

23

122.    Defendants' advertising practices cause substantial injury to consumers by creating the false impression that Plaintiffs are employees or entertainers at, endorse, or are otherwise affiliated with, their establishment.

123.    There are no benefits to Defendants' advertising practices as set forth hereon except a benefit to Defendants' own commercial interests.

124.    As a result of Defendants' unauthorized and misleading publication of Plaintiffs' Images on their establishment's website and social media accounts, Plaintiffs were harmed.

125.    As a result of Defendants' unauthorized and misleading use of Plaintiffs' Images, Plaintiffs have suffered damages in an amount to be determined at trial, including punitive and exemplary damages.


## FIFTH CAUSE OF ACTION

### (Defamation)

126.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

127.    As detailed throughout this Complaint, Defendants have published altered Images of Plaintiffs in order to promote their establishment to the general public and potential clientele.

128.    Defendants' publication of said Images constitutes a representation that Plaintiffs were either employed by the Defendants, that they endorsed their establishment, or that they had some affiliation with their establishment.

24

129.    None of these representations were true. In publishing Plaintiffs' altered Images, it was Defendants' intention to create a false impression to the general public that Plaintiffs were employees working at their establishment or endorsed their establishment.

130.    Defendants were at least negligent in publishing Plaintiffs' Images because they knew, or should have known, that Plaintiffs were not employed by their establishment, had no affiliation with their establishment, had not consented to the use of their Images, and had not been compensated for the use of their Images.

131.    In the alternative, Defendants published the Images of Plaintiffs with actual malice because they knew that Plaintiffs were not employed by their establishment, had no affiliation with their establishment, had not consented to the use of their Images, and had not been compensated for the use of their Images.

132.    Despite Defendant's knowledge and awareness of these facts, they nevertheless made the decision to publish Plaintiffs' Images to attract clientele and generate revenue for themselves.

133.    Defendants' publication of Plaintiffs' Images constitutes defamation under Arizona law because said publication falsely accuses Plaintiffs of having acted in a manner – i.e., working as an entertainer and/or endorsing Boycott - which would subject each Plaintiffs to hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, and/or could induce an evil opinion of Plaintiffs in the minds of right-thinking persons, and/or could deprive each Plaintiff of confidence and friendly intercourse in society.

134.    Defendants' publication of Plaintiffs' Images likewise constitutes defamation per se under Arizona law because said publication would tend to injure each Plaintiff in their trade, business, and profession as  professional models.

135.    Any company or brand that sought to hire any of the Plaintiffs as a company or brand representative would be less likely to do so upon learning that they were associated with Defendants' establishment, an inference which Defendants' publication of the Images support.

136.    Defendants' publication of Plaintiffs' Images likewise constitutes defamation per se under Arizona law because said publication falsely portrays each of the Plaintiffs as an employee, entertainer, or otherwise associated with Defendants and in doing so imputes unchastity to them.

137.    Defendants' publication of Plaintiffs' Images caused Plaintiffs to suffer damages in an amount to be determined at trial and are likewise entitled to punitive and exemplary damages.

## SIXTH CAUSE OF ACTION

### (Negligence and Respondeat Superior)

138.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

139.    Plaintiffs are further informed and believe and hereon allege that Defendants maintained or should have maintained employee policies and procedures which govern the use of intellectual property, publicity rights, and/or the image and

likeness of individuals for promotional and advertising purposes which specifically prevent the unauthorized and non-consensual use of intellectual property, publicity rights and/or the image and likeness of individuals for promotional and advertising purposes.

140.    Further, Defendants should have maintained, or failed to maintain, policies and procedures to ensure that their promotional and/or advertising materials and campaigns were not deceptive or misleading in their advertising practices.

141.    Defendants owed a duty of care to Plaintiffs to ensure that their advertising and promotional materials and practices did not infringe on their property and publicity rights.

142.    Defendants further owed a duty of care to consumers at large to ensure that their promotional and/or advertising materials and campaigns were not deceptive or misleading in their advertising practices.

143.    Defendants breached their duty of care to both Plaintiffs and consumers by failing to either adhere to or implement policies and procedures to ensure that the use of intellectual property, publicity rights, and/or the image and likeness of individuals for promotional and advertising purposes were not unauthorized, non-consensual, or false and deceptive.

144.    Defendants further failed to enforce or implement the above-stated policies and/or to communicate them to employees, and/or supervise their employees in order to ensure that these policies, along with Federal and Arizona law, were not violated. Defendants breached their duty of care to Plaintiffs and consumers by their

negligent hiring, screening, retaining, supervising, and/or training of its employees and agents.

145. Defendants' breach was the proximate cause of the harm Plaintiffs suffered when their Images were published without their consent, authorization, and done so in a false, misleading and/or deceptive manner.

146. As a result of Defendants' negligence, Plaintiffs have suffered damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Conversion)

147. Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

148. Each Plaintiff is, and at all relevant times was, the exclusive owner of all right, title and interest in its Image, and has property interests thereon.

149. By the conduct detailed above, Defendants converted Plaintiffs' property rights in their Images for their own use and financial gain.

150. As a result of Defendants' unlawful conversion of Plaintiffs' Images, and publication of same, Plaintiffs have suffered damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment)

151.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

152.    As set forth in detail above, Defendants published Plaintiffs' Images in order to promote the Defendants' establishment to the general public and potential clientele.

153.    Defendants' publication was for the purpose of creating a false impression to the general public that Plaintiffs are either employees or entertainers working at the establishment, or otherwise endorsed the same.

154.    Defendants' purpose in publishing Plaintiffs' Images was to benefit commercially due to their purported association with, employment of, and/or endorsement by Plaintiffs.

155.    Upon information and belief, Defendants did in fact benefit commercially due to their unauthorized use of Plaintiffs' Images.

156.    Defendants have been enriched by their unauthorized control over, and publication of, Plaintiffs' Image because said publication has assisted Defendants in attracting clientele to their establishment.

157.    Plaintiffs have not been compensated for Defendants' commercial exploitation of their Images, and thus any financial benefit which Defendants received due to said exploitation is unjust.

158.    As such, Plaintiffs have been damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Quantum Meruit)

159.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

160.    Plaintiffs are each internationally known models who earn their livings appearing in, inter alia, commercials, advertisements, and publications on behalf of companies and brands.

161.    Companies and brands that choose to hire Plaintiffs compensate them for their appearances.

162.    Although Defendants have availed themselves of the benefit of being associated with Plaintiffs, and making it appear to potential customers that Plaintiffs either work for, endorse, or are otherwise affiliated with their establishment, Defendants have not compensated Plaintiffs.

163.    Plaintiffs are therefore entitled to reasonable compensation for Defendant's unauthorized use of their Images.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

### PRAYER FOR RELIEF

Plaintiffs respectfully request Judgment in their favor and against Defendants as follows:

(a) For actual damages, in an amount to be determined at trial, relating to Plaintiffs' Causes of Action;

(b) For an order permanently enjoining Defendants from using Plaintiffs' Images to promote The Alement;

(c) For punitive damages and treble damages under the Lanham Act, 15 U.S.C. § 1117 ;

(d) For all costs and attorneys' fees incurred by Plaintiffs in the prosecution of this Action pursuant to the Lanham Act, 15 U.S.C.§ 1117;

(e) For such other and further relief as the Court may deem just and proper.


Dated: January 23, 2025.




/s/ Amy Wilkins Hoffman

Amy Wilkins Hoffman
**FROST LLP**
99 E. Virginia Ave., Ste. 220
Phoenix, Arizona 85004
Tel: 480-466-7005
amyh@frostllp.com

John V. Golaszewski
New York Bar No. 4121091
Pro Hac Vice Application Forthcoming
**THE CASAS LAW FIRM, P.C.**
1740 Broadway, 15th fl.
New York, NY 10019
Tel: 855-267-4457
Fax: 855-220-9626
john@talentrights.law